UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BOBBY J. WILLIAMS, )
)
Petitioner, )
)
v. ) No. 4:11-CV-02059-RWS
)
UNITED STATES OF AMERICA, )
)
Respondent. )

**MEMORANDUM AND ORDER**

This matter is before me on the motion of Bobby J. Williams to vacate, set aside, or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255. In his § 2255 motion, Williams alleges: (1) the prosecutor's witnesses knowingly gave perjured testimony and false evidence to the grand jury as well as the trial jury in order to obtain Williams' conviction; (2) the prosecutor knowingly introduced the perjured testimony and false evidence; (3) Williams' conviction was obtained by the prosecutor's failure to disclose favorable evidence to Williams; and (4) Williams received ineffective assistance of counsel. Because all of Williams' claims are without merit, his motion is denied.

## I. BACKGROUND

The relevant facts were set forth in the opinion of the Eighth Circuit Court of Appeals, United States v. Williams, 605 F.3d 556 (8th Cir. 2010):

> In August 2006, United States Postal Inspector Bryan Witt began investigating packages mailed between Oakland, California, and St. Louis, Missouri, based upon suspicious postal packages observed in St. Louis. Witt reviewed parcel records looking for characteristics common to packages discovered to have contained drugs. Witt identified a significant number of such packages having a similar weight, and all but one were mailed from the same post

office in Oakland. Witt obtained copies of eight shipping labels that he believed to be related. With the cooperation of informants Diane Pittman and Rickey Miller, Witt connected Bobby Williams to mail shipments of MDMA to St. Louis.

Witt took possession of the package. He found that the package had a fictitious return address, originated in Oakland, and was addressed to a fictitious name. The listed sender was Van Le (later identified as Thu Van Dinh, a.k.a. Van Le, Le Van, and "T"). The name "Le Van" was on four other packages. A narcotics-detection dog was called and alerted on the package, indicating the presence of the odor of a controlled substance. Witt obtained a federal search warrant and found the contents of the box to be four vacuum-sealed bags each containing approximately 1000 tablets. The pills tested positive for MDMA. A postal worker subsequently left an "attempt to deliver" notice at the Granada address. The following day, Shawana Miller, Rickey Miller's sister, attempted to claim the package. The package had been addressed to "Kim Tuck," and Shawana Miller was unable to provide identification in that name and left without the package. Rickey and Shawana Miller returned to the post office shortly thereafter, and Rickey was given the package. He and his sister were then arrested. Both agreed to cooperate, and a series of recorded phone calls were made to the telephone number of the person that Rickey Miller knew to be the source of supply.

Soon after, Witt found the labels for two additional packages that fit the pattern of the original eight. One, the ninth package, was mailed on February 9, 2007, to Bobby Williams. The package was mailed from Oakland but had a return address of P.O. Box 9169 in Richmond Heights, Missouri. The P.O. Box was listed to Bobby Williams Jr. Witt recognized that name as the name of the subject of a money-laundering investigation involving postal money orders being sent between St. Louis, Missouri and San Francisco, California, in April 2006. The tenth suspicious parcel label showed that the package originated in the San Francisco metropolitan area, it used a fictitious name and return address and was destined for St. Louis, Missouri. The return address listed Mike Smith at 516 O'Farrell in San Francisco, California. Witt identified a number of postal money orders associated with Williams that used the name Mike Smith. The ninth and tenth labels were associated back to the narcotics investigation because the return address of 537 Post Avenue in San Francisco, California, a fictitious address, was on

one of the original eight packages.

Witt pursued the money-laundering investigation by locating records for a series of postal money orders dating from March 6, 2006, to April 5, 2006. On March 6, 2006, two $1000 postal money orders were purchased with cash in East St. Louis, Illinois, by James Smith, 675 Post, San Francisco, California. Williams negotiated both money orders the following day at a Bank of America in San Francisco, California. Witt identified the account holder as Bobby Williams Jr. at P.O. Box 9169, Richmond Heights, Missouri. Witt determined that 675 Post in San Francisco did not exist.

On April 5, 2006, Mike Smith of 589 O'Farrell, San Francisco, California, purchased six $1000 postal money orders from four different post office branches in the St. Louis area. “O'Farrell” had been used on some of the earlier parcel labels. All six were cashed at the same time on April 7, 2006-by Williams-at the same San Francisco Bank of America branch using the same account number as the first two. The bank account records also showed that on April 5, 2006, an additional $3000 was deposited in St. Louis, Missouri to the same San Francisco bank account.

During the investigation, Witt learned that Williams was incarcerated in late May 2006 through sometime in January 2007. Bank and credit card records showed that Williams paid down his Bank of America credit card balance shortly before going to prison by making cash payments of almost $20,000 between May 10, 2006, and May 24, 2006. Once out of prison, almost $7000 in cash deposits were made to Williams' account between May 12, 2007, and June 27, 2007. Western Union records also showed that between December 27, 2005, and May 24, 2006, the day before Williams reported to prison, seven Western Union money orders totaling $13,500 were sent to Williams by codefendants or their relatives.

Southwest Airlines records showed that between December 29, 2005, and November 29, 2007, Williams flew to or from St. Louis, Missouri and Oakland, California, 76 times, spending approximately $24,000 on airfare. Records obtained from the Internal Revenue Service showed that Williams filed no tax returns for tax years 2004-2007.

B. Diane Pittman

Pittman testified that Miller introduced her to Williams, his cousin, because Miller wanted her to take drug money on an airplane to California, accompanied by Williams in March or April 2006. She had been in a relationship with Miller since she was 16 and had lived with him-off and on-since then. Pittman testified that Williams wanted the drug supplier, “T,” to meet Pittman and know her face so that she could take over when Williams was incarcerated. An Asian man picked them up at the airport and took them to “T.” Williams gave “T” the money. While in California, Williams and Pittman went to a post office where they mailed a package containing MDMA back to St. Louis. Pittman made another ten to 12 trips to Oakland after Williams went to prison on an unrelated charge.

Pittman testified that when Williams left for prison, Williams instructed Miller to continue to mail the money to “T” as if Williams was there. Pittman understood that “T” was going to save the money for Williams to preserve his income during his incarceration.

On June 6 or 7, 2006, St. Louis airport security stopped Pittman and seized $37,251 cash from her. Pittman lied to the Drug Enforcement Agency about who gave her the money to transport, not mentioning Miller or Williams. On July 8, 2006, Jennings, Missouri police officers found and seized marijuana, drug paraphernalia, a firearm, and $41,000 in cash at the home that Pittman shared with Miller. Pittman told the police that the money came from Miller's sale of MDMA. She did not mention Williams. Pittman stopped flying to Oakland at that time. Instead, she started mailing the drug money Miller earned to “T” in Oakland.

C. Terrell Terry

Terrell Terry testified that he had known Miller and Pittman most of his life. In late 2005, Miller introduced Terry to Williams. In early 2006, Miller and Terry were selling marijuana that they received from Williams. Miller received the marijuana from California through the mail. Terry testified that one day Miller asked Williams if he could get Ecstasy, and Williams said he could get Ecstasy pills for $1 per pill but would charge $2 to $2.50 for them. Miller and Terry bought $3000 worth of Ecstasy from

Williams. A group thereafter began to make regular purchases of Ecstasy from Williams, and approximately ten boxes of Ecstasy came through the mail from January 2006 through June 2006, when Terry left the operation and branched off on his own. Williams was present every time the pills initially arrived, and he would then leave when the time came to split up a batch of pills.

The price of pills went up sometime in February, March or April 2006. Terry testified that Miller told him that Williams was raising the price on the pills an extra 25 cents because Williams was going to turn himself in to do some jail time and wanted to make some more money before he was incarcerated. The pills went up to $2.75 per pill. Terry estimated that he personally sold 25,000 to 30,000 pills during his involvement in the scheme. Terry and Miller continued to sell the pills while Williams was incarcerated. Terry testified that Miller told him that Miller was putting the extra money up for Williams.

Williams, along with nine codefendants, was indicted on December 6, 2007, for conspiracy to possess with the intent to distribute MDMA in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count I"), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I) ("Count II"). The total amount of MDMA attributed to the conspiracy was 28,000 units or 7000 grams. The presentence investigation report (PSR) attributed the entire amount of MDMA to Williams.

A jury found Williams guilty of both counts. Williams filed a pro se motion for a new trial based on ineffective assistance of counsel, pro se objections to the PSR and a pro se motion to dismiss for violation of the Speedy Trial Act. Williams's attorney also filed objections to the PSR. Williams denied that the convictions filed in the role-in-the-offense enhancement under 21 U.S.C. § 851 were his convictions. The defense's objections included general denials of being involved in a conspiracy or laundering money. Williams also challenged the drug quantity allegations, his role in the offense, and his criminal history. The district court denied all of Williams's motions and overruled all of his objections. The PSR set Williams's total offense level at 38 and his criminal history at V producing a Guidelines incarceration range of 360 months to life, with a statutory maximum sentence of 360 months. The court sentenced Williams to 360 months' imprisonment on the drug charge and 240 months' imprisonment on

> the money laundering charge, to be served concurrently. A six-year term of supervised release (three years concurrent on Count II) was also ordered.

Williams then appealed his conviction and sentence to the Eighth Circuit Court of Appeals. On appeal, Williams argued I: (1) erred in overruling his motion for judgment of acquittal based on insufficient evidence that he laundered money; (2) abused my discretion by rejecting a jury instruction defining the scope of illicit proceeds in money laundering cases; (3) erred in the calculation of MDMA attributable to Williams because he was incarcerated for part of the conspiracy; (4) erred in applying a four-level role-in-the offense enhancement or, alternatively, the enhancement created an unwarranted disparity among similarly situated codefendants; and (5) erred in failing to dismiss the indictment for a violation of the Speedy Trial Act.

The Eighth Circuit denied Williams' claims on appeal and affirmed Williams' conviction and sentence. Williams did not file a writ of certiorari to the United States Supreme Court. Williams then filed the instant motion pursuant to 28 U.S.C. § 2255.

## II. STANDARD OF REVIEW: RELIEF UNDER 28 U.S.C. § 2255

A federal prisoner may seek relief from a sentence imposed against him "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Nonconstitutional claims based on a federal statute or rule, rather than on a specific constitutional guarantee, "can be raised on collateral review only if the alleged error constituted a fundamental defect which inherently results in a complete miscarriage of justice." Reed v. Farley, 512 U.S. 339, 354 (1994) (internal quotations omitted).

Section 2255 claims may also be limited by procedural default. "A petitioner simply cannot raise a nonconstitutional or nonjurisdictional issue in a § 2255 motion if the issue could have been raised on direct appeal but was not." Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). If a claim could have been raised on direct appeal but was not, it cannot be raised in a § 2255 motion unless the petitioner can show both (1) a "cause" that excuses the default, and (2) "actual prejudice" resulting from the errors of which he complains. See Ramey v. United States, 8 F.3d 1313, 1314 (8th Cir. 1993); Mathews v. United States, 114 F.3d 112, 113 (8th Cir. 1997).[1] "Actual prejudice" requires a showing that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (internal quotation marks and citation omitted).

Here, Williams alleges that he could not have raised his first three claims on direct appeal because they are based on "newly discovered evidence." See English v. United States, 998 F.2d 609, 611 (8th Cir. 1993) (new trial allowable when: (1) new evidence discovered after trial; (2) late discovery not attributable to lack of diligence on part of petitioner; (3) evidence not merely cumulative or impeaching; (4) evidence is material; and (5) evidence likely to produce acquittal). If true, they would not be precluded from review. However, none of the evidence he relies on is in fact "newly-discovered" because it was available to him before trial and could have been

[1]Petitioner can also avoid procedural default by demonstrating actual innocence. Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) ("In order to obtain collateral review of a procedurally defaulted issue, a § 2255 petitioner must show either cause and actual prejudice, or that he is actually innocent.") (internal quotation marks and citations omitted). Actual innocence is a strict standard that generally cannot be met "where the evidence is sufficient to support a conviction on the charged offense." Id. (internal quotation marks and citation omitted).

discovered but for his lack of diligence. Even if Williams could excuse the procedural default of these claims, they still fail for the reasons that follow.

## III. DISCUSSION

### A. PROSECUTION'S USE OF PERJURED TESTIMONY AND FAILURE TO DISCLOSE FAVORABLE EVIDENCE

Williams' primary argument is that newly discovered evidence demonstrates several government witnesses committed perjury. Specifically, he alleges United States Inspector, Bryan Witt, committed perjury with regard to the validity of two addresses used in connecting Williams to the conspiracy to possess with intent to distribute MDMA as well as the associated money laundering charge. He also argues that not only Witt but also another government witness, co-defendant Diane Pittman, committed perjury when testifying that Williams flew on Southwest Airlines on May 23, 2006. Finally, Williams argues that the prosecutor failed to inform his trial counsel that the addresses were valid and that the Southwest Airlines flight was only a reservation, while at the same time using this allegedly false evidence to bolster the prosecution's allegations.

At trial, Witt testified that the "516 O'Farrell San Francisco, California " return address on the March 8, 2007 package was fictitious, and therefore could be connected to nine other suspicious packages with common characteristics of a parcel known to contain drugs. Witt also testified that the "675 Post" address on the March 6, 2006 postal money orders (which were payable to Williams) appeared to be fictitious. Although a different street number, Witt had come across a "Post" street earlier in his investigation. Further, Witt testified that a Southwest Airlines records listed a flight for Williams on May 23, 2006. Co-defendant Diane Pittman also testified

that she flew with Williams on Southwest Airlines and was with Williams in California on May 24, 2006.

To support his allegation that this testimony was false, Williams provides evidence that both "516 O'Farrell" and "675 Post" are, in fact, valid addresses. He also has a letter from Southwest Airlines stating that, on May 23, 2006, Williams had a flight reserved but not purchased. Williams argues the prosecution knew or should have known about this allegedly "favorable" information but used the "perjured" testimony anyway. Williams claims this amounted to prosecutorial misconduct in violation of his due process rights.

Williams' claim fails because there is no evidence that Witt perjured himself. Although Williams presents evidence which he believes contradicts Witt's testimony, that, in and of itself does not prove Witt perjured himself. "Merely inconsistent statements do not establish use of false testimony." West, 612 F.3d at 996. Upon cross-examination, Witt admitted that the conclusions he drew about the addresses were from review of his database and were only as accurate as the information in that database. He also admitted that neither he nor anyone on his behalf ever visited those actual addresses to check if they existed. Even if the 516 O'Farrell address actually exists, Williams' evidence still does not prove that the return address was not fictitious because it was addressed to a false identity -- "Mike Smith" -- used by Williams. Because there is no "Mike Smith" who actually resides or receives mail at the 516 O'Farrell address, the return address is fictitious. Therefore, Williams' claim that Witt's testimony was false must fail.

The same is true of the 675 Post address. Two postal money orders were purchased on March 6, 2006, each for $1,000, with cash in East St. Louis, Illinois, by a "James Smith," 675

Post, San Francisco, California. Williams negotiated both money orders the following day at a Bank of America in San Francisco, California. Williams has not demonstrated that this is not a fictitious address (even if a 675 Post really does exist) because there is no evidence that a James Smith actually lived there. Because Williams cannot demonstrate that Witt's testimony was perjured, his claim fails.

Next, Williams contends that newly discovered evidence proves he never flew on May 23, 2006, on Southwest Airlines, but rather only made a reservation. This is not new evidence as the prosecution introduced Southwest Airlines records that labeled the May 23, 2006, flight for Bobby Williams as a reservation, or "RES." Because Witt testified in accordance with the airline records, his testimony was not perjured. Williams' claim will therefore be denied as meritless.

As for Diane Pittman, she testified that Bobby Williams flew with her to Oakland, California via Southwest Airlines and was with him in Oakland on May 24, 2006. She did not testify about the May 23, 2006 flight reservation. Therefore, this allegedly newly-discovered evidence does not demonstrate the falsity of her testimony, especially when it was shown at trial that criminals often use fictitious names in association with their criminal activities. Moreover, it was established that Williams spent about $24,000 on airfare and took 76 flights on Southwest to or from St. Louis and Oakland during the relevant time period. "[T]he jury determines credibility and weighs conflicting evidence." United States v. Johnson, 519 F.3d 816, 822 (8th Cir. 2008). Williams' § 2255 motion on this ground fails.[2]

---

[2]Williams also argues that the prosecutor knowingly introduced perjured testimony when co-defendant, Terrell Terry, testified that he believed Rickey Miller asked Williams if Williams could get some ecstasy. Tr. at 201. In support of his claim that this testimony is false, Williams claims that it differs from Miller's confession to Witt about how he became involved with dealing ecstasy. However, "[m]erely inconsistent statements do not establish use of false testimony."

**B. INEFFECTIVE ASSISTANCE OF COUNSEL**

Williams also claims that his attorney was ineffective for failing to investigate the validity of the 516 O'Farrell address, 675 Post address, and the Southwest Airlines records. Williams further argues that had counsel investigated the validity of the 589 O'Farrell address associated with the April 6, 2006 postal money orders, he would have discovered that although 589 O'Farrell is not a real address, it should have been 589 Post, which is a valid address.

A movant "faces a heavy burden" to establish ineffective assistance of counsel pursuant to section 2255. DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000). To succeed on an ineffective assistance of counsel claim, a movant must show that counsel's performance was deficient and that the deficient performance prejudiced the movant's case. Strickland v. Washington, 466 U.S. 668, 687 (1984); United States v. Sera, 267 F.3d 872, 874 (8th Cir. 2001); DeRoo, 223 F.3d at 925.

An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Strickland, at 687-88; Sera, 267 F.3d at 874. There are two substantial impediments to making such a showing. First, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (quoting Strickland, 466 U.S. at 689); Sera, 267 F.3d at 874. See also Ford v. Lockhart, 905 F.2d 458, 462 (8th Cir. 1990) (evaluation of a claim of ineffective

---

West, 612 F.3d at 996. This evidence is not "newly discovered" because defense counsel questioned the witness about his inconsistent statements and argued to the jury that Miller would do anything in exchange for a possible reduction in his sentence. Tr. at 243. Because this argument could have been raised on direct appeal and was not, it is procedurally defaulted and cannot be considered here absent a sufficient showing of cause and prejudice. Here Williams makes no attempt to demonstrate adequate cause for his procedural default, so this claim will be denied.

assistance of counsel is highly deferential with a strong presumption that counsel acted competently). Second, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Rice, 449 F.3d at 897 (quoting Strickland, 466 U.S. at 690). When reviewing counsel's performance, a court must avoid using "the distorting effects of hindsight" and must evaluate the reasonableness of counsel's conduct "from counsel's perspective at the time." Strickland, 466 U.S. at 689.

In addition to proving a deficiency in counsel's performance, the movant must also prove that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Strickland, 466 U.S. at 692. The burden is on the movant to prove, by a preponderance of the evidence, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; DeRoo, 223 F.3d at 925.

A court need not even determine whether a movant meets the "performance" prong of the Strickland test because both the United States Supreme Court and this Court have noted that "'[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" Young v. Bowersox, 161 F.3d 1159, 1160 (8th Cir. 1998) (quoting Strickland, 466 U.S. at 697), cert. denied, 528 U.S. 880 (1998). See also Kingsberry v. United States, 202 F.3d 1030, 1032 (8th Cir.) (if the petitioner makes an insufficient showing on one component, the court need not address both components), cert. denied, 531 U.S. 829 (2000).

Here, Williams cannot demonstrate the requisite prejudice from any alleged errors by

counsel for the reasons already discussed above.[3] Because there was no perjured testimony and the evidence of Williams' guilt was overwhelming, there is no probability that the result of his trial would have been different had counsel investigated these addresses and airline records.

For these reasons Williams' § 2255 motion will be denied.

## IV. REQUEST FOR EVIDENTIARY HEARING

Where "the motion, files, and records of the case conclusively show that [the movant] is entitled to no relief," an evidentiary hearing on a § 2255 is not required. Anjulo-Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008). (internal quotation marks and citation omitted). Where the record refutes each claim, the movant is not entitled to an evidentiary hearing. Because the record conclusively refutes each of Williams' claims, he is not entitled to an evidentiary hearing. Watson v. United States, 493 F.3d 960, 963 (8th Cir. 2007).

## V. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from a final order in a § 2255 proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). To grant such certificate, the judge must find a substantial showing of the denial of a federal constitutional right. Id. at § 2253(c)(2); Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997). Because Williams has not made such a showing, I will not issue a certificate of appealability.

---

[3]Williams also cannot show prejudice with respect to the 589 O'Farrell address because, as Williams admits, it is a fictitious address.

Accordingly,

**IT IS HEREBY ORDERED** that Bobby J. Williams' Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [#1] is **denied.**

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this ____day of December, 2012.